which is related. This is Reed v. Chamblee et al. Case number 24-10058. We'll give a minute for counsel to switch out. Thank you. All right, it looks like everyone is settled in. Counsel, whenever you're ready. Yes, this related action was brought by Mr. Reed against several journalists and publishers below. Mr. Reed filed this suit alleging claims for defamation and other claims. Defamation per se, defamation by implication. After the case had been pending, as in the related case, for about a year, without the benefit of any discovery to develop his claims, the district court dismissed all claims in the case. So it seems to me that the allegations in this one are more centered, I know it's not, I'm going to generalize, but are more centered on the than on what we'll call the cheating dispute. Is that fair? That is fair. The majority of claims in here involve the oven concerning requirement. Okay, so how do you get around what I read to be the Florida rule defining sort of group, we'll call group libel or group defamation, which seems to suggest that where the group is greater than 25, you sort of need more specificity than just this group is really, really bad and then levels all these accusations against the group. What do we make of that? The requirement, I believe the court's referring to Thomas versus Jacksonville television. I think we all know the case law. Where the fishermen brought the action. The exception there would be, I think under the facts of this case, is whether it can be proven that there is a reference to a particular member of a group for group libel, as opposed to an indeterminable class which would not be actionable. Right, and I think for some of these it does mention Mr. Reid, but for most of these it seems to reference the group generally, and for some it seems clear if you look at context, it's actually talking about Mr. Mickelson or somebody else. Accurate. The issue here is that LIB at the time in 2022 had a couple of notable faces, one of which was Mr. Reid, probably primary. There were a couple of other very high-profile golfers. Brooks Koepka, Bryson DeChambeau was a member at that time. So we would submit that the... And you have to add Mr. Norman and Mr. Mickelson in that group too. I mean those were, those seem to me to be, and this is maybe a little bit outside of the pleadings here, but you know as someone who has watched a golf tournament or two in their lives, those seem to be the people that were out front of this more than Mr. Reid, right? Well, I think Mr. Reid was one of the leading faces of LIB golf, and certainly the treatment of him in the media made him even more so. You know, going back to the Companion case, he was, he's been sort of painted as the wrong way, as the villain or bad boy of golf. But what import is there, the culture of sports is, by its very nature, is competitive, can be harsh and cruel. So again, just recognizing that these are sports commentators, news stories, reflecting the sentiment of fans, how does that cross over into the actual malice or falsity? Again, the elements that have to be satisfied for the claim. Well, the nature of the comments, and I understand, Your Honor, your point about sports and competition, but if you look at the statements made by the defendants in this matter, they are very prejudicial to Mr. Reid, they're very defamatory and malicious. Basically, I put them into buckets. They accuse Mr. Reid and the other players of LIB of aligning with, you know, a murderous regime which commits atrocities. They accuse them of playing for blood money and sports washing. I mean, like I said earlier, Mr. Reid has kind of been singled out, unfairly, as a villain in these statements. And he is, I think that demonstrates malice. Like I said before in my other argument, the nature of the statement itself, if it's defamatory per se, that demonstrates maliciousness. Let's say you have satisfied the first three elements of the claim. What are the damages that Mr. Reid is alleging he suffered? Beyond just general reputational. I mean, can we put a dollar sign? I'm certain Mr. Reid, as a result of the reputation which has developed as a result of statements such as these by the defendants, he's lost valuable endorsements and partnerships with large corporations. It has really harmed him and he definitely can demonstrate damages and significant ones. But going back to of and concerning, Mr. Reid did not have the benefit of any discovery in this case, but we believe that if he developed that, he could have an opportunity to develop evidence that would show, under a group liable theory, that any statements concerning LIB at the time would have been referring to Mr. Reid and a small group of people. The problem though is that under Iqbal and Twombly, what the Supreme Court has said is you don't sort of plead your way into discovery. You have to get to discovery through plausible allegations. Now, we could have a whole conversation about whether that's fair or not and whether that should be the law, but that is the law. And so it seems to me that at least with regard to the group ones, it is incumbent in the pleading to make that case of when it refers to LIB, it means X, Y, or Z, including my client. And I'm just not sure that that showing has been made. Why don't you focus on the ones and maybe point us to the ones that you think are specific to Mr. Reid, either because it named him or there's no other implication other than it's Mr. Reid? Well, the complaint does allege a few under the court's buckets, a few statements that directly relate to Mr. Reid by Mr. Shambly, especially where Mr. Shambly talks about Mr. Reid doing things legally or illegally, ethically, where he doesn't state his basis for making that remark that was going to be protected by the court, violating an unwritten code. But going to the general statements about LIB, you know, there's commentary by Mr. Shambly on a podcast talking about a tournament and the LIB players in the tournament, where he talks about the players, you know, playing for a tyrannical murderous leader. And then he brings up playing for Stalin, Hitler. So I'll try to focus us as much as we can. Let's look at paragraphs, we'll call it 91 through 97 or 98. And there, what you have is, it seems to be specific criticisms of LIB and the Saudi regime. So for example, the criticism of LIB defectors, we're talking about the same time period you're talking about, is not that they are doing this for money, that is easily understood. It's that they're so easily understood is why they would directly work for the regime that has such a reprehensible record on human rights, so on and so forth. I mean, again, that gets back to the group issue and the oven concerning. Where is those specific to Mr. Reid that you're talking about? Well, he isn't referenced in directly in a lot of these remarks by Mr. Shambly. So I'm asking you to tell me where, show me your best one with regard to this particular complaint that it's directly referenced to, it's a direct reference to Mr. Reid. I would actually say the defector reference is a reference to people who have left, who left the PGA Tour. All of them left the PGA Tour. Right, correct. So that refers to everybody, all 48, right? Yes. Again, you have to make it, the specific language is of and concerning the plaintiff. So can you just point to the complaint allegations that are specific to Mr. Reid? Well, we would submit that in the context when the statements came up on Twitter, as we've alleged in our complaint, LIV, even though it had a number of players, it had very few or only a handful of very high profile players. And that these statements can be demonstrated to be of and concerning him. Mr. Reid is one of the leading figures, but for several of these, the declarant doesn't point out Mr. Reid directly. So that's of and concerning would have to be established through discovery relating to LIV and its representatives at the time. But Mr. Reid does allege in his complaint, he's one of the most- Can I go back to the aligning comment, the podcast that you were talking about? I mean, there, and again, looking at the allegations, this is paragraphs 58, it's really 57 through 64 of the complaint. There, it seems specific that they're referencing, because they do, Mr. Mickelson and Mr. Norman as the ones who are, they're just the, quote unquote, destroying the professional game, right? That is correct. That is correct. We have alleged other things relating to that podcast that were sort of general statements against LIV players. Of course, we have statements from Mr. Shambly and Mr. Hack and Mr. Bacon, which directly concern Mr. Reid. Let's, we're going to hear from your opposing counsel, and you've reserved four minutes for rebuttal. Yes, Your Honor. Thank you so much. May it please the court, Rachel Fugate from Shulman Fugate, on behalf of the Golf Channel Appellees, TGC, LLC, Brandel Shambly, Damon Hack, Benjamin Macon, and Eamon Lynch. With respect to the Golf Channel Appellees, there are the two buckets of statements, primarily the LIV statements, but then there are some statements regarding the Farmers Insurance Open. Both of those, with respect to the LIV statements, properly dismissed as of and but also protected opinion, as were the Farmers Open Insurance statements. Is there none that you think that will fall under the LIV statements that can be attributed either by direct reference or just by the nature of the implication of what they're describing, that it refers to Mr. Reid? I don't believe so, Your Honor. None of them? The only, I don't believe any of them can. The only publication that actually has a brief reference to Mr. Reid is that 30-minute podcast. And there, Mr. Shambly doesn't mention Reid. The host at the beginning of the show does mention Mr. Reid, but that's very divorced from comments that come much later in the podcast, where Mr. Shambly is expressing his opinion about LIV. And as Your Honor noted, those statements were directly tied to Mr. Mickelson and Mr. Norman when he said that they were ruining the game. So I don't think those can be attributed to Mr. Reid. But the court also found that those statements were also protected opinion. So on both sets, none of them are actionable under either because they're not of a concerning or protected opinion. And then you also have the other problem that there was no sufficient allegations of actual malice. But what is the line? So when I saw a lot of the statements, which could be characterized as accusations or allegations, it made me think of when people are, you know, it's reported that someone was arrested or someone was indicted. These are things that ultimately could end up not being true or that someone was released because there wasn't any support, et cetera. But why doesn't, why don't these comments, these allegations of cheating, of, you know, inappropriate behavior that LIV is advancing, why don't those, why aren't those kind of in the same category and therefore require a little bit more balance in terms of reporting? Well, I think with the allegations from the Farmers Insurance Open, which were very different than the statements about the live conduct, those were statements that were directed at Mr. Reid. Those are protected opinion because they did disclose the facts. You know, they showed video of what happened. They had Mr. Reid defending himself. And even the publication, they were both clear that Reid was absolved of a rule violation, that that did not happen. But what these golf, and you're on the golf channel, so you have golf commentators commenting to an audience who is familiar with these situations, saying that even with that, even with him being cleared, they were not comfortable based upon the video and what they saw of his conduct around the ball. They didn't accuse him of cheating. They said it wasn't transparent. It was questionable. Mr. Chamblee expressed his opinion that legally he was allowed to do it. But what he felt is that there was a difference between that and what he was ethically allowed to do around the ball. And there was an unwritten code of how golfers act. That's core opinion. They can look at Mr. Reid's conduct, and even though it was cleared, still have questions about it. And those are the questions that they expressed in the Farmer's Insurance Open publications. And those are absolutely privileged, core public opinion. In the Forston case out of the Southern District, when you have sports commentaries, you expect to get some invective. You expect to get hyperbole. It's a haven for those sorts of comments. So then what's the line? I mean, what that means forever, and we know that it's not forever, because there have been successful defamation suits against publications and news channels. What is the line to be drawn then when it comes to acknowledging that someone, there are no facts to support the allegations, and yet you still have the opinion that the allegation was valid? What is the line to make sure that, again, Mr. Reid's perspective is represented, and that it doesn't lead to, nevertheless, convicting someone of something that hasn't been established? Yeah, it's not always a clear line, and it usually depends upon the context of the publication, which for opinion is so important. You know, that context is critical. You know, if you have a straight news story, it's going to be a little bit different than commentary on the golf channel. You look at those cautionary words. You look at what was disclosed to support that other side. So there's never going to be a black or white answer, a clear-cut answer, whether something is protected opinion. You have to look at the context of the publication, and here you have golf commentators in the sports world who had a problem with Mr. Reid's conduct around the ball, but they were clear. His position was represented in the golf channel broadcast with Mr. Bacon and Mr. Hack. They showed his explanation. They had the rules official saying he was cleared, but what they were saying is, I don't like it. It still looks bad optically because it wasn't transparent how he hovered around the ball. They're entitled to that opinion, and that's what the First Amendment protects. They disclosed the basis for it and its core protected sports commentary opinion. The live... Would it be different if it didn't have all that context? In other words, I understand the commentary to be what you've described, they showed the video of what happened, they discussed the ruling of the official at that time and his explanation, and then it's the commentary part where they say, I just don't like it, and they said what they said. If all that beginning stuff wasn't there, and they just went straight to them and said, what happened today was horrible and disgusting and should never happen in golf, and he is an unethical snob, without the other stuff, would that be... Would you say that's pure opinion? It would definitely be a closer call, because... I understand Florida law to be pure opinion, you need the other stuff, right? Well, actually, under the Fromm case, it's either facts that are disclosed or facts that are otherwise known to that audience. Yeah, but that's not... Right. This was real time. In other words, unlike some of the stuff we were talking about before, which had been in the sort of the golf zeitgeist. Right. This was not. This was the day. Right. Yeah. So it certainly would be a closer call, and then you have to, you know, what were those undisclosed facts, which we didn't have here, because we disclosed them, and would that be something that would be known to the Golf Channel's audience, who follows golf, and you can expect them to know certain things. So I think it would be a closer call, but you would still have to look at the context and what was said, and also whether it qualified as rhetorical hyperbole, you know, which was kind of those exaggerated statements that people really don't believe as a statement of fact. Unethical, though, is something people understand. Yes, and I think in this context, it was clearly disclosed the basis for that. So if we had not disclosed that, I think it would be a closer call, and you'd have to look at the context and what was disclosed, but it certainly would be a closer call, but that's not the case here. Many of the live statements do fall into that rhetorical hyperbole category. You know, maybe some do, but when you start comparing people to some of the worst human beings that have ever existed on the face of the earth, and saying that you're in bed with them or aligned with them, how is that hyperbole? I mean, like, yes, at some point, we can, you know, we can say things that we all know are sort of jokey or kidding or are used for effect, but that's a little more than used for effect, is it not? And I think that is actually kind of the rub of hyperbole is on its face that it can appear to state a statement of fact, and the rub is that almost the more outrageous the statement is, the more it's likely to be hyperbole because people will not look at it in context as an act of fact. But this isn't outrageous in that sense. I mean, there is fact and truth underlying this. And so it's not, for some people, it's not a far reach to say that one regime is similar to or compared to other regimes. In other words, this isn't hyperbolic in that way. It is a comparison which is within people's understanding and certainly draw inferences from that that are pretty clear and well understood among the public. Well, and I think with that, in addition to hyperbole, when you're saying that he's aligned with that, you have the opinion of the regime, which I think it's fair to say is tyrannical, is brutal. And whether somebody's aligning themselves, it was a Saudi-backed golf tournament. That was the fact that went along with that and they're playing for that tournament. That's the derivative opinion. So the facts don't have to be fulsome, but the facts that form the basis of that were disclosed. And I see my time is up, Your Honor, if there are no more questions. Thank you very much. Thank you. Good morning again. For the record, Carol LeCicero for Apple E! This time, Gannett and Golf Week Magazine. The only article that's mentioned in the initial brief, and I want to be careful because the case against Golf Week involves now only one article. And the title of that article was Lynch PGA Tours War with Live Golf Enters Return of the Jedi Phase. There was a second article below. I read the initial brief as making a brief mention of it in the statement of the case at page nine and then no further reference, right? That's right. So with regard to, under our case law, with regard to defendants, Lynch, Gannett Company, Gannett Satellite Information, that we'll call the Golf Week folks. Is that an abandonment or a forfeiture under our case law? Yes, Your Honor. I mean, that's the most straightforward, simple argument related to Gannett and the Golf Week. By the way, that's not a dispersion on anyone. Everyone understands this case involved 50 individual statements. We hope on appeal that people limit things down and bring to us just what's there. So this isn't a dispersion on anybody. I get it, you know, in a limited page brief, you can only mention and talk about so much, so. That's right, Your Honor. That's our primary argument is that all the claims against Gannett, Golf Week, were waived on appeal because they were only mentioned in the background facts and the court has been very clear as recently as Moore versus Cecil, that that's not enough. I'm happy to answer any further questions or just rely on the waiver. I don't have any more, but I don't want to, you have a minute and a half and I don't want to take your time away. That's, you know, that we could get into the substance, but I don't think the plain, the appellant does. But the grounds were rhetorical hyperbole and it's a lot of Star Wars imagery, lack of oven concerning and then some substantial truth. Thank you, Your Honors. Thank you. Good morning, Your Honors, and may it please the court, Jay Brown from Ballard Spar on behalf of the New Yorker magazine defendant, which I, of course, phrased in that way because the plaintiff named a non-existent entity as the publisher of the magazine. So, again, I understand the district court dismissed defendant's health and we'll call the New Yorker, but Connie Nast, the publisher, dismissed those from the case. Is that right? Correct, Your Honor. And that's not been appealed as an alternative. Other things have been appealed, but that particular dismissal has not been appealed. That is certainly our position, Your Honor, that as to both the magazine and the author of the article in question, that the plaintiff has waived any arguments on appeal regarding the procedural grounds for dismissal of them. Again, I don't want to cut you off. I just wanted to clarify that so that I understand. And that was my main reason for speaking separately on behalf of the New Yorker because it is procedurally situated differently from other of the defendants here. And we do believe the court should simply affirm the district court on that ground, the procedural grounds for dismissal in light of plaintiff's waiver of them, but also because on the merits on those procedural grounds, the district court was correct. And to the extent that the court were for any reason to disagree with those procedural grounds, the arguments regarding actual malice and opinion made by counsel for the co-defendants apply equally to the single passage in the article from the New Yorker describing the public controversy about Mr. Reed, the pre-existing public controversy in the context of an article about professional golf and live. And so if for some reason you were to disregard the procedural failings, the dismissal should be affirmed on that ground as well. But having said that, unless the court has particular questions for me, I'll rest there. And I think your brief, you know, well adopts those things, even if you hadn't done it directly here at oral argument too. Thank you, Your Honor. Thank you. Counsel will hear from you. We have four minutes. Your Honor, we would disagree with the abandonment grounds brought up by representatives for Mr. Lynch. That comes from a case Moore v. Cecil, which is a per curiam opinion, which was issued during the pendency of this case. That case relied for authority on decisions in Lacroix v. Tanafort Myers and Sapupo v. Allstate, which talk about abandoning issues or arguments. Right, but. Yes, sir. So still, is there any, well, just answer me this. I've read the briefs carefully. Is there any other reference to the Lynch, I'll call it the Lynch article, other than on page nine in the statement of case section of your brief? No, Your Honor. I mean, you know, if it was addressed, it was addressed in our general argument. Right, and certainly you've raised issues regarding actual malice. You've raised issues regarding other concerning. But it has to be in the context of specific defamatory statements. And you've certainly identified, we've talked extensively about the ones that you did talk about in your brief. But I'm having trouble finding anywhere in your brief where we brought that up regarding the Lynch article. But we'll take another close look at it to make sure. Thank you, Your Honor. And we would also point out that this is an appeal of a motion to dismiss, which is reviewed to no vote, including the court's findings and conclusions of law. I'm going to Mr. Reed's claims in this case. Mr. Reed believes that he plausibly alleged actual malice. Counsel got up and talked about Mr. Shambly's statements. On the podcast, we would submit that those are defamatory where he talks about Mr. Reed being legally and ethically questionable. Those impugn his character. The other concerning, we would argue that those statements should be, that should be a question for the jury. That's a jury issue on a case-by-case basis. Mr. Reed has had no discovery in this case. He's had no opportunity to develop the evidence. We would submit that finally, Mr. Reed, the court did use actual malice as grounds for dismissal. Under the, I believe it's Michelle versus New York Times holding, the court said dismissal based on failure to plead the facts, giving rise to an inference of actual malice should be without prejudice and the plaintiff should have an opportunity to amend his complaint. What happened in this case is that the district court sua sponte dismissed Mr. Reed's initial complaint and it gave us grounds for that. The fact that it was allegedly a shotgun pleading by virtue of having incorporation by reference into the various counts and that it didn't comply with the short and plain statement rule from rule eight. Mr. Reed was never put on notice that the court had a problem with his allegations of actual malice and we would submit that the dismissal of this complaint pursuant to the standard under Michelle is improper. Mr. Reed should, that the court's order should be reversed and he should be given an opportunity to amend his complaint. But isn't that because the district court also found that it would be futile? So what, I mean, this is what you have like over 400 allegations here, the whole history of his life story in these articles. What more could you possibly offer in an amended complaint? Well, Mr. Reed, initially when his complaint was, Your Honor, when it was dismissed, he made extensive changes to it and filed a notice with the court informing the court of all the ways that he had changed his complaint to correspond to the court's direction. That is a fact indicating the record that Mr. Reed is capable of amending his pleadings. To address any potential deficiencies with his claims, so. Thank you, counsel. Thank you. We appreciate everyone's effort. We're going to turn to our